151 T.C. No. 13

UNITED STATES TAX COURT

ALTERNATIVE HEALTH CARE ADVOCATES, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 16123-14, 30186-14,      Filed December 20, 2018.
8813-15,  8850-15,
8852-15, 12321-15.

In these consolidated cases C, a corporation, operates a medical marijuana dispensary in California. Other Ps were individual shareholders of S, an S corporation that was organized to handle daily operations for C including paying employee wages and salaries. C deducted I.R.C. sec. 162 business expenses and later adjusted COGS to include indirect expenses per I.R.C. sec. 263A. R determined that both C's and S's sole trade or business was trafficking in a controlled substance and that I.R.C. sec. 280E precluded C's and S's deducting business expenses. In light of that determination, R further

---

[1] Cases of the following petitioners are consolidated herewith: Donald Duncan a.k.a. Don D. Duncan a.k.a. Don Duncan, docket No. 30186-14; Jeremy S. Kwit, docket Nos. 8813-15 and 12321-15; and Grant Rozmarin, docket Nos. 8850-15 and 8852-15.

determined that Ps had underreported their flowthrough income from
S.  R also determined that C is not entitled to COGS in an amount
greater than what R already allowed and that C is liable for I.R.C. sec.
6662(a) accuracy-related penalties.

Held:  I.R.C. sec. 280E precludes C from deducting I.R.C. sec.
162 business expenses.

Held, further, I.R.C. sec. 280E precludes S from deducting
I.R.C. sec. 162 business expenses.

Held, further, Ps underreported their flowthrough income
from S.

Held, further, C is not entitled to a COGS greater than what
respondent has allowed.

Held, further, C is liable for I.R.C. sec. 6662(a) accuracy-
related penalties.

Henry G. Wykowski, Christopher J. Wood, and Matthew A. Williams, for

petitioners.

Audra M. Dineen and Ina Susan Weiner, for respondent.

PUGH, Judge:  Respondent determined deficiencies, additions to tax, and

penalties as follows:[2]

---

[2] Unless otherwise indicated, all section references are to the Internal
Revenue Code of 1986, as amended and in effect for the years at issue.  Rule

(continued...)

Alternative Health Care Advocates, docket No. 16123-14

| Year | Deficiency | Addition to tax sec. 6651(a)(1) | Penalty sec. 6662(a) |
|------|-----------|---------------------------------|----------------------|
| 2009 | $384,665 | $38,447 | $76,933 |
| 2010 | 367,316 | 91,829 | 73,463 |

Donald Duncan, docket No. 30186-14

| Year | Deficiency | Addition to tax sec. 6651(a)(1) |
|------|-----------|---------------------------------|
| 2009 | $245,151 | $61,023 |
| 2010 | 247,891 | 37,062 |
| 2011 | 163,118 | 38,530 |
| 2012 | 308,174 | 46,175 |

---

[2](...continued)
references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

The notices of deficiency were sent on the following dates: Petitioner Alternative Health Care Advocates (Alternative) on April 14, 2014; petitioner Donald Duncan on October 8, 2014; petitioner Jeremy Kwit on Jan. 7, 2015, for the 2012 tax year and on April 6, 2015, for the 2011 tax year; and petitioner Grant Rozmarin on Jan. 7, 2015.

Jeremy S. Kwit, docket Nos. 8813-15 and 12321-15

|  |  | Additions to tax | | | |
|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6651(a)(2) | Sec. 6654(a) | Penalty sec. 6662(a) |
| 2011 | $7,920 | $826 | - - - | - - - | - - - |
| 2012 | 39,693 | 8,931 | $4,168 | $712 | $7,939 |

Grant Rozmarin, docket Nos. 8850-15 and 8852-15

|  |  | Additions to tax | | | |
|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6651(a)(2) | Sec. 6654(a) | Penalty sec. 6662(a) |
| 2011 | $10,213 | $2,298 | $1,685 | $202 | $2,043 |
| 2012 | 19,846 | 2,084 | 2,084 | 356 | 3,969 |

After concessions,[3] the issues for decision are: (1) whether respondent properly disallowed deductions for Alternative's expenses pursuant to section 280E; (2) whether Mr. Duncan, Mr. Kwit, and Mr. Rozmarin underreported their flowthrough income from their S corporation, Wellness Management Group, Inc. (Wellness), because section 280E also applied to disallow Wellness' deductions; (3) whether Alternative is entitled to deduct cost of goods sold (COGS) in amounts greater than those respondent allowed; and (4) whether Alternative is liable for a section 6662(a) accuracy-related penalty for 2009 or 2010.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Alternative was a California corporation with its primary place of business in West Hollywood,

---

[3] On December 6, 2016, the parties filed a Stipulation of Settled Issues in which the following concessions were made: (1) Alternative is liable for a sec. 6651(a)(1) addition to tax for its 2009 and 2010 taxable years to the extent there is an underpayment for each year; (2) Mr. Duncan is liable for a sec. 6651(a)(1) addition to tax for the taxable years 2009 through 2012 to the extent there is an underpayment for each year; (3) Mr. Kwit is liable for a sec. 6651(a)(1) addition to tax for the 2011 and 2012 taxable years to the extent there is an underpayment for each year; (4) Mr. Kwit is not liable for the sec. 6651(a)(2) addition to tax, adjustment for other taxes, sec. 6654(a) addition to tax, or the sec. 6662(a) accuracy-related penalty for the 2012 taxable year; (5) Mr. Rozmarin is liable for the sec. 6651(a)(1) addition to tax for the 2011 and 2012 taxable years and the sec. 6654(a) addition to tax for the 2011 and 2012 taxable years to the extent there is an underpayment for each tax year; and (6) Mr. Rozmarin is not liable for the sec. 6651(a)(2) addition to tax, adjustment for other taxes, or the sec. 6662(a) accuracy-related penalties for the 2011 and 2012 taxable years.

California, when its petition was timely filed. Mr. Duncan and Mr. Rozmarin resided in California, and Mr. Kwit resided in Oregon, when their petitions were timely filed.

## I. Background on Petitioners and Wellness

### A. Donald Duncan

Mr. Duncan--a graduate of the University of North Texas and former business student at Vista Community College--is a businessman and consultant experienced in the formation and operation of medical marijuana dispensaries in California.[4] In 1999 Mr. Duncan founded Berkeley Patients Group, a medical marijuana dispensary located in Berkeley, California. In 2006 Mr. Duncan assisted with opening California Patients Group, a medical marijuana dispensary in Los Angeles, and served as a consultant for medical marijuana facilities in Palm Springs, Malibu, and other locations throughout California. Mr. Duncan's consulting activities included advising dispensary operators on best practices for screening members, securing the facility, and ensuring proper screening of

---

[4] The provision of medical marijuana to patients in the State of California is permitted by the Compassionate Use Act of 1996. See Cal. Health & Safety Code sec. 11362.5 (West 1996). Pursuant to California Senate Bill No. 420 (Medical Marijuana Program Act of 2003), individuals or groups are prohibited from cultivating or distributing marijuana for profit. See Cal. Health & Safety Code, sec. 11362.765; Canna Care, Inc. v. Commissioner, T.C. Memo. 2015-206, aff'd, 694 F. App'x 570 (9th Cir. 2017).

medical marijuana. Mr. Duncan is also a cofounder and member of the board of directors of Americans for Safe Access, a patient advocacy organization.

B. Alternative

While operating Berkeley Patients Group, Mr. Duncan and his colleagues identified an opportunity for growth in a new market, observing that members of Berkeley Patients Group were traveling long distances from southern California to obtain medical marijuana. Therefore, in 2004 Mr. Duncan opened a second location in Los Angeles, initially naming the new dispensary Los Angeles Patients and Caregivers Group. In 2008 Mr. Duncan organized Alternative--a California corporation[5]--to operate this medical marijuana dispensary. Alternative is a California nonprofit mutual benefit corporation with members, rather than shareholders, that is treated as a C corporation for Federal tax purposes.

Mr. Duncan served as Alternative's president, and Richard Kearns served as its secretary. Mr. Kwit was a patient-member of the dispensary and served as a cultivator and consultant. Mr. Rozmarin served as a manager of the dispensary

---

[5] Alternative originally was named LAPC [Los Angeles Patients & Caregivers] Foundations, Inc. On September 8, 2010, Amended and Restated Articles of Incorporation were filed with the California secretary of state, changing the name of the corporation to Alternative.

and was responsible for handling administrative and staffing matters, performing human resource functions, and procuring and processing marijuana.

C. Wellness

In 2008 Mr. Duncan also organized a second entity, Wellness--a California corporation that elected S corporation status for Federal tax purposes--to handle daily operations for Alternative.[6] At the time Alternative was organized, Mr. Duncan was uncertain what dispensaries could do legally under California State law aside from growing and providing medical marijuana to patients. So Wellness was organized to perform functions for the medical marijuana dispensary such as hiring employees and paying expenses, including advertising, wages, and rent. While Mr. Duncan anticipated that Wellness might offer its management and operations services to other medical marijuana dispensaries, Wellness performed services solely for Alternative during the tax years at issue.

Wellness was owned by four shareholders: Mr. Duncan owned 80%; Mr. Kwit owned 10%; Mr. Rozmarin owned 5%; and Cori Escalante--a manager of the dispensary--owned 5%. Wellness maintained an office separate from Alternative

---

[6] Wellness originally was named Los Angeles Patients & Caregivers Group, Inc. On August 19, 2010, a Certificate of Amendment of Articles of Incorporation was filed with the California secretary of state, changing the name of the corporation to Wellness and listing Mr. Duncan as its president and Mr. Rozmarin as its secretary.

but also used the dispensary's address as a mailing address during the taxable years at issue.

## II.  Operations of the Dispensary

During the taxable years at issue Alternative intended to distribute medical marijuana to its patient-members in accordance with California law.  The dispensary employed (through Wellness) administrators, security personnel, marijuana processors, salespersons, and receptionists.  The following is a detailed description of the dispensary's business operations and processes.

### A.  Patient Intake Process

Upon patients' arrival at Alternative's dispensary, security personnel would check their credentials, including proper identification and a doctor's letter recommending use of medical marijuana.  Patients then entered the dispensary facility and were greeted by a receptionist who would determine whether the patients were current members of the collective or were new patients.  New patients were required to present their doctor's letter and identification for verification, and dispensary staff would call their doctor to verify the recommendation.  Dispensary staff also would check the California Department of Consumer Affairs online directory to confirm that the doctor was licensed to practice medicine in the State of California.  Dispensary staff would conduct an

intake interview to explain the rules of the facility and complete necessary paperwork. Patient-members then were able to enter the sales floor of the dispensary. Patient-members who purchased marijuana used cash or credit cards and were charged sales tax on their purchases.

B.  Acquisition of Marijuana

Pursuant to guidelines published by the California State attorney general in August 2008, collective and cooperative associations engaged in acquiring and distributing medical marijuana conducted their sales in a closed circuit. Guidelines for the Security and Non-Diversion of Marijuana Grown for Medical Use (August 2008). The closed-circuit process ensured that medical marijuana was only purchased from or sold to members of the collective. Id. Alternative, in compliance with these guidelines, acquired various forms of medical marijuana from its patient-members. Alternative's medical marijuana offerings included hash, kief, cuttings (or clones), edibles, tinctures, and oils. Alternative also offered forms of marijuana that could be applied topically.

Before acquiring the medical marijuana from a patient-member, a manager of the dispensary conducted a quality inspection to ensure the overall appearance, smell, and desirability of the product. Cash payments were issued to patient-members upon successful completion of the inspection.

C. <u>Processing of Marijuana Products</u>

Alternative acquired marijuana from its members in various preparations or forms. Hash is a concentrated resin of the cannabis plant, and kief is a nonconcentrated resin of the cannabis plant. A cutting, or clone, is the cannabis plant itself that patient-members can take home, grow, and bring back to the dispensary. Edible preparations are foods--typically made with oil and butter--that contain marijuana. Tinctures, or alcohol tinctures, are a form of marijuana that can be taken under the tongue. Finally, oils are extracted from the cannabis plant and can be taken orally or smoked. The edibles, tinctures, oils, and forms of marijuana meant for topical applications were purchased in a condition ready for resale, but other products required some additional preparation and maintenance.

The dispensary employed (through Wellness) processors whose responsibilities included preparing the acquired marijuana products for sale. Marijuana was typically divided into quarter-pound increments for processing. Processors would break up and package marijuana in smaller increments (typically bags of one gram or 3-1/2 grams). In some instances processors were required to dry marijuana that arrived damp, to prevent mold or mildew. Sometimes processors would have to prepare cannabis flowers--the portion of the cannabis plant used as medicine--for resale by trimming and removing undesirable leaves

and stems from the cannabis plant. Additionally, dispensary employees were responsible for maintaining the clones (live cannabis plants) in a humid environment pending resale. Dispensary staff worked to ensure roots were kept moist and monitored the clones daily for pest infestations.

Most of the dispensary's floor space was used to acquire, process, or sell marijuana. Similarly, employee time was spent mostly on acquiring, processing, or selling marijuana. Security personnel spent 15% of their time processing marijuana products and 75% of their time selling marijuana; receptionists spent 10% of their time processing marijuana and 80% selling marijuana;[7] customer service representatives spent 10% of their time processing marijuana and 80% of their time selling marijuana; processors spent all of their time processing marijuana products; and managers spent 40% of their time acquiring marijuana and 30% to 40% selling marijuana.

D. Sale of Nonmarijuana Items

While medical marijuana accounted for most of Alternative's sales, it also offered nonmarijuana items. Specifically, Alternative sold books, T-shirts and

---

[7] At trial Susana de la Rionda--the general manager of the dispensary--estimated that receptionists spent between 42% and 49% of their time on marijuana sales but otherwise estimated that most employee time was spent on marijuana-related activities.

hats, rolling papers, pipes, grinders, incense, lighters, ashtrays, and cleaning supplies for pipes and bongs. These items did not take up much floor space. Mr. Duncan estimated the following percentage breakdown of employee time related to the sale of nonmarijuana products: 10% for security personnel; 10% for receptionists;[8] 10% for customer service representatives; and 15% for managers.

E. Finances

Alternative paid patient-members for the marijuana products that they provided and made all sales tax payments. But Wellness paid Alternative's other expenses, such as advertising, wages, and rent, and was reimbursed by Alternative for the expenses it paid. At times, however, those expenses were paid directly by Alternative.

Alternative maintained two bank accounts with JP Morgan Chase Bank and held a credit card machine merchant account and related deposit account with Bank of America. Several bank accounts were held by Alternative (under its prior name, Los Angeles Patients & Caregivers Group): credit card machine merchant accounts with Bank of America, American Express, and Discover, and a bank

---

[8] Ms. de la Rionda recalled at trial that receptionists spent between 21% and 28% of their time on the sale of nonmarijuana products.

account with Wells Fargo.[9] Mr. Duncan, Mr. Rozmarin, and Ms. Escalante each were authorized signors on the Wells Fargo account. Wellness maintained bank accounts with JP Morgan Chase and Wells Fargo.

Alternative and Wellness both used QuickBooks software to manage their finances and shared the computer in which financial information was entered.[10] Employees who were responsible for entering sales and expense information into QuickBooks categorized certain entries as taxable or nontaxable and classified certain products in a "hemp store" category. While the dispensary's procedure was to include marijuana products in the nontaxable sales category and nonmarijuana products in the hemp store or taxable sales category, a change to its bookkeeping procedure may have resulted in improper categorization. Sales entries for marijuana and nonmarijuana products were combined into single entries classified as "Donations" in QuickBooks; no distinction was made between the two product categories on the dispensary's financial records.

---

[9] The Wells Fargo account was held in the name "Los Angeles Patients &."

[10] In 2010 the shared computer crashed, rendering inaccessible Alternative's and Wellness' QuickBooks data. Alternative and Wellness had several problems with the shared computer following the initial crash in 2010. Financial documents for Alternative and Wellness were reconstructed in preparation for respondent's audit.

III. Income Tax Returns

A. Alternative

Alternative filed Forms 1120, U.S. Corporation Income Tax Return, for the 2009 and 2010 taxable years. Alternative's Forms 1120 were prepared by its accountant, F. Michael Watson. Mr. Watson was referred to Mr. Duncan by an individual who ran a medical marijuana dispensary in Los Angeles. Alternative prepared financial statements for the taxable years at issue. Mr. Watson used only Alternative's financial statements to prepare the Forms 1120; Alternative did not provide Mr. Watson with any other documents to complete its income tax returns.

Alternative's 2009 Form 1120 lists "Medicine Sales" as its business activity. Alternative reported $2,780,952 of gross receipts from the sale of medical marijuana on its 2009 Form 1120. Alternative subtracted from gross receipts $1,622,925 of COGS--an amount respondent allowed in its entirety. Additionally, Alternative claimed deductions totaling $1,101,772 for 2009, consisting of $700 of rent, $11,098 of taxes and licenses, $698 of depreciation, $9,064 of advertising, and $1,080,212 of other deductions (including $896,975 for contract services and $34,723 for outside services).

Alternative's 2010 Form 1120 lists "Medicine Sales" as its business activity. Alternative reported $2,803,521 of gross receipts from the sale of

medical marijuana on its 2010 Form 1120. Alternative subtracted from gross receipts $1,712,020 of COGS--an amount respondent allowed in its entirety. Additionally, Alternative claimed deductions totaling $1,066,183 for 2010, consisting of $2,816 of charitable contributions, $59 of advertising, and $1,063,308 of other deductions (including $961,985 for contract services).

B. Wellness

Wellness filed Forms 1120S, U.S. Income Tax Return for an S Corporation, for the 2009, 2010, 2011, and 2012 taxable years, listing "Management" as its principal business activity. On its 2009 Form 1120S, Wellness reported gross receipts of $922,936 and claimed deductions totaling $890,890.[11] Wellness' deductions consisted of $227,916 of compensation of officers, $318,534 of salaries and wages, $64,713 of rent, $47,432 of taxes and licenses, $22,761 of advertising, and $209,534 of other deductions.

On its 2010 Form 1120S, Wellness reported gross receipts of $961,985 and claimed deductions totaling $911,791. Wellness' deductions consisted of $222,122 of compensation of officers, $343,552 of salaries and wages, $69,123 of

---

[11] The parties did not explain why Alternative's deductions for contract services and outside services did not equal Wellness' gross receipts for 2009.

rent, $48,322 of taxes and licenses, $15,422 of advertising, and $213,250 of other deductions.

On its 2011 Form 1120S, Wellness reported $582,655 of gross receipts and claimed deductions totaling $757,092. Wellness' deductions consisted of $222,122 of compensation of officers, $274,711 of salaries and wages, $1,583 of repairs and maintenance, $95,025 of rent, $5,494 of taxes and licenses, $2,221 of depreciation, $12,589 of advertising, and $143,347 of other deductions.

Finally, on its 2012 Form 1120S, Wellness reported $1,127,170 of gross receipts and claimed deductions totaling $1,116,701. Wellness' deductions consisted of $524,727 of salaries and wages, $2,420 of repairs and maintenance, $94,430 of rent, $209,128 of taxes and licenses, $15,882 of advertising, and $270,114 of other deductions.

C. Donald Duncan

Mr. Duncan filed Forms 1040, U.S. Individual Income Tax Return, for the 2009, 2010, 2011, and 2012 taxable years. Mr. Duncan attached Schedules E, Supplemental Income and Loss, to his Forms 1040 for the 2009 and 2010 taxable years. Mr. Duncan reported $8,349 of nonpassive income related to his interest in Wellness on his 2009 Schedule E. Additionally, Mr. Duncan reported $31,529 of nonpassive income related to his interest in Wellness on his 2010 Schedule E. Mr.

Duncan did not report Schedule E income or losses on either his 2011 or his 2012 Form 1040.

### D. Jeremy Kwit

Mr. Kwit filed Forms 1040 for the 2011 and 2012 taxable years.[12]  Mr. Kwit did not report any income or loss with respect to his interest in Wellness on his 2011 Form 1040.  Mr. Kwit attached a Schedule E to his 2012 Form 1040, reporting $1,739 of nonpassive income related to his interest in Wellness.

### E. Grant Rozmarin

Mr. Rozmarin did not file Forms 1040 before the notices of deficiency were issued to him for the 2011 and 2012 taxable years.

### OPINION

## I. Burden of Proof

The taxpayer generally has the burden of proving that the Commissioner's determinations in a notice of deficiency are incorrect.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  The burden of proof may shift from the taxpayer to the Commissioner in certain circumstances under section 7491(a).

---

[12] Mr. Kwit's 2012 Form 1040 was filed after the notice of deficiency was issued for the 2012 taxable year.

Petitioners have not claimed or shown that they meet the requirements of section 7491(a) to shift the burden of proof to respondent as to any relevant factual issue.

II. Deductions--Alternative

Deductions are a matter of legislative grace, and a taxpayer must prove its entitlement to deductions. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Taxpayers must maintain sufficient records to substantiate any deductions claimed. Sec. 6001.

Section 162(a) generally permits a taxpayer to deduct ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Section 261, however, provides that "[i]n computing taxable income, no deduction shall in any case be allowed in respect of the items specified in this part." "[T]his part" includes section 280E, Expenditures in Connection With the Illegal Sale of Drugs. See Californians Helping to Alleviate Medical Problems, Inc. v. Commissioner (CHAMP), 128 T.C. 173, 180 (2007). Section 280E provides:

> No deduction or credit shall be allowed for any amount paid or incurred during the taxable year in carrying on any trade or business if such trade or business (or the activities which comprise such trade or business) consists of trafficking in controlled substances (within the meaning of schedule I and II of the Controlled Substances Act)

which is prohibited by Federal law or the law of any State in which such trade or business is conducted.

Section 280E, therefore, bars the deduction of expenses by (1) a trade or business that is (2) trafficking in (3) a controlled substance. See Canna Care, Inc. v. Commissioner, T.C. Memo. 2015-206, at *8, aff'd, 694 F. App'x 570 (9th Cir. 2017). We address the existence of these elements in reverse order.

A. Controlled Substance

Petitioners acknowledge that marijuana is a controlled substance within the meaning of schedules I and II of the Controlled Substances Act. See Controlled Substances Act, Pub. L. No. 91-513, sec. 202, 84 Stat. at 1249 (1970) (codified as amended at 21 U.S.C. sec. 812 (2012)). Marijuana is a schedule I controlled substance in the context of section 280E even when the marijuana is medical marijuana recommended by a physician. See, e.g., United States v. Oakland Cannabis Buyers' Coop., 532 U.S. 483 (2001); Olive v. Commissioner, 139 T.C. 19 (2012), aff'd, 792 F.3d 1146 (9th Cir. 2015); CHAMP, 128 T.C. at 181; Sundel v. Commissioner, T.C. Memo. 1998-78, aff'd without published opinion, 201 F.3d 428 (1st Cir. 1999). We, therefore, find that the controlled substance element of section 280E is satisfied.

B. Trafficking

Section 280E does not define "trafficking" in controlled substances. In CHAMP, 128 T.C. at 182, we defined "trafficking" as the act of engaging in a commercial activity--that is, to buy and sell regularly. In Olive v. Commissioner, 139 T.C. at 38, we held that "dispensing * * * medical marijuana pursuant to * * * [California law] was 'trafficking' within the meaning of section 280E." In the Controlled Substances Act, "[t]he term 'dispense' means to deliver a controlled substance to an ultimate user". 21 U.S.C. sec. 802(10); see id. sec. 841(a)(1) (prohibiting the manufacture, distribution, dispensation, or possession of marijuana).

Section 7208, which criminalizes certain offenses relating to stamps, is the only section in the Internal Revenue Code that explicitly defines the term "trafficking". Section 7208(4)(B) defines "trafficking" as "[k]nowingly or willfully buy[ing], sell[ing], offer[ing] for sale, or giv[ing] away * * * washed or restored stamp[s] to any person for use". While the Internal Revenue Code is silent with respect to trafficking in controlled substances, congressional findings and declarations on controlled substances, see 21 U.S.C. sec. 801(2), describe it as "[t]he illegal importation, manufacture, distribution, and possession and improper use of controlled substances". Further, the Federal statute criminalizing

trafficking in counterfeit goods or services provides that "the term 'traffic' means to transport, transfer, or otherwise dispose of, to another, for purposes of commercial advantage or private financial gain, or to make, import, export, obtain control of, or possess, with intent to so transport, transfer, or otherwise dispose of".  18 U.S.C. sec. 2320(f)(5) (2012).

Petitioners do not dispute that Alternative was selling marijuana.  While petitioners acknowledge that marijuana is a controlled substance, they claim that section 280E does not preclude dispensaries operating legally under State law from deducting expenses related to the sale of medical marijuana.  Petitioners assert that section 280E should not apply because Alternative's activities did not "consist of" drug trafficking.  Petitioners first argue that, under a plain reading of the statute, "Alternative's varied commercial activities place it squarely outside the reach of [section] 280E."  Petitioners assert that because Alternative's activities did not consist solely of trafficking in medical marijuana, its expenses should be deductible.  Petitioners further argue that under a "purpose-based judicial interpretation", section 280E does not apply to Alternative because Congress never intended that State-legal marijuana dispensaries be barred from deducting business expenses.

We have held previously that section 280E applies to medical marijuana dispensaries even though they are operating in compliance with the laws of their jurisdictions. See Patients Mutual Assistance Collective Corp. v. Commissioner (Patients Mutual), 151 T.C. ___ (Nov. 29, 2018); Olive v. Commissioner, 139 T.C. at 38; CHAMP, 128 T.C. at 182-183; Canna Care, Inc. v. Commissioner, T.C. Memo. 2015-206. Further, in Olive v. Commissioner, 139 T.C. at 38, we explicitly rejected the same arguments the taxpayers made in that case with respect to the "consists of" language in section 280E:[13]

> Petitioner argues that he may deduct the Vapor Room's expenses notwithstanding section 280E because, he claims, the Vapor Room's business did not consist of the illegal trafficking in a controlled substance. He argues that the illegal trafficking in controlled substances is the only activity covered by section 280E. We disagree that section 280E is that narrow and does not apply here. We therefore reject petitioner's contention that section 280E does not apply here because the Vapor Room was a legitimate operation under California law. We have previously held that a California medical marijuana dispensary's dispensing of medical marijuana pursuant to the CCUA was "trafficking" within the meaning of section 280E. That holding applies here with full force. [Citations omitted]

Our decision was affirmed by the Court of Appeals for the Ninth Circuit, to which an appeal of these cases would lie. See Golsen v. Commissioner, 54 T.C. 742 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971). The Court of Appeals concluded that

---

[13] The taxpayer in Olive was represented by the same counsel representing petitioners in the present case.

the taxpayer's only "business" was selling medical marijuana because the caregiving services were not a separate business. Olive v. Commissioner, 792 F.3d at 1149-1150. In response to the taxpayer's arguments related to congressional intent and public policy, the court concluded that "[i]f Congress now thinks that the policy embodied in * * * [section] 280E is unwise as applied to medical marijuana sold in conformance with state law, it can change the statute. We may not." Id. at 1150. Petitioners fail to distinguish these cases from Olive.

We, therefore, find that Alternative was engaged in "trafficking" in a controlled substance within the meaning of section 280E.

C. Trade or Business

Petitioners do not dispute that Alternative is in the trade or business of selling marijuana but argue that Alternative also operates a separate trade or business consisting of the sale of nonmarijuana items. Petitioners assert that Alternative is entitled to allocate its expenses between its "trafficking" and "non-trafficking" businesses.

For an activity to qualify as a trade or business for purposes of the Internal Revenue Code, "the taxpayer must be involved in the activity with continuity and regularity and * * * the taxpayer's primary purpose for engaging in the activity must be for income or profit." Commissioner v. Groetzinger, 480 U.S. 23, 35

(1987). A single taxpayer can have more than one trade or business, and multiple activities may nevertheless constitute a single trade or business. Patients Mutual, 151 T.C. at ___ (slip op. at 37). Compare CHAMP, 128 T.C. at 183 (holding that the taxpayer--which operated a community center for members with debilitating diseases and charged a membership fee that covered only a fixed amount of marijuana--was engaged in two separate trades or businesses and, therefore, was entitled to an allocation of expenses), with Olive v. Commissioner, 139 T.C. at 39-42 (holding that the taxpayer--which operated a community-center whose sole source of revenue was from the sale of marijuana--had a single trade or business and was precluded from deducting expenses pursuant to section 280E), and Canna Care v. Commissioner, at *12-*13 (holding that--where the taxpayer was in the business of distributing medical marijuana and its only other source of income was its sale of books, T-shirts, and other nonmarijuana items--the sale of nonmarijuana items "was an activity incident to" the taxpayer's sole business of selling marijuana and the taxpayer was precluded from deducting expenses pursuant to section 280E). Further, the activities of separate entities can be treated as a single trade or business if they are part of a "unified business enterprise" with a single profit motive. Patients Mutual, 151 T.C. at ___ (slip op. at 37) (quoting Morton v. United States, 98 Fed. Cl. 596, 600 (2011)).

Petitioners direct us to two methods by which we can allocate expenses between trafficking and nontrafficking activities: the percentage of employee time dedicated to each activity and the percentage of floor space devoted to each activity. Petitioners cite the trial testimony of Mr. Duncan and Ms. de la Rionda to support their proposed allocation methods.

The percentages Mr. Duncan assigned at trial to marijuana and nonmarijuana activities seemed improvised, but the import of his testimony and that of Ms. de la Rionda is that Alternative's primary activity was operating a marijuana dispensary and the nonmarijuana activities were only ancillary--not occupying much time or space. Their allocation of floor space and employee activities both show that the receipt and sale of marijuana was the dominant activity and that the sale of nonmarijuana products had "a close and inseparable organizational and economic relationship" with--and was "incident to"-- Alternative's primary business of selling marijuana. Patients Mutual, 151 T.C. at ___ (slip op. at 41-42) (quoting Olive v. Commissioner, 139 T.C. at 41).

We, therefore, hold that pursuant to section 280E Alternative is not entitled to its claimed deductions for the taxable years at issue.

III. Deductions--Wellness

We next must determine whether Mr. Duncan, Mr. Kwit, and Mr. Rozmarin had unreported income with respect to their ownership interests in Wellness.

Section 1366(a)(1) provides that shareholders of an S corporation shall take into account their pro rata shares of the S corporation's income, loss, deductions, and credits for the S corporation's taxable year ending with or in the shareholder's taxable year. See CNT Inv'rs, LLC v. Commissioner, 144 T.C. 161, 178 n.23 (2015). An S corporation's shareholders must take into account the S corporation's income regardless of whether any income is distributed. See Enis v. Commissioner, T.C. Memo. 2017-222, at *15; Dunne v. Commissioner, T.C. Memo. 2008-63, at *20; Chen v. Commissioner, T.C. Memo. 2006-160, at *14. Therefore, as shareholders of Wellness--an S corporation during the taxable years at issue--Mr. Duncan, Mr. Kwit, and Mr. Rozmarin each must include his pro rata shares of Wellness' income, loss, deductions, and credits on their income tax returns.

Petitioners argue that in computing Mr. Duncan, Mr. Kwit, and Mr. Rozmarin's pro rata shares of Wellness' income, respondent wrongly applied section 280E to disallow Wellness' claimed deductions. Specifically, petitioners argue that because Wellness is a management company that does not engage in the

sale and purchase of marijuana, section 280E does not apply.  Petitioners cite Davis v. Commissioner, 29 T.C. 878 (1958), and Roselle v. Commissioner, T.C. Memo. 1981-394, to support their argument that a management services company can engage in a separate line of business from the entity it manages.

Because Alternative and Wellness are legally separate entities, we must analyze whether Wellness' own business activities also constituted "trafficking in controlled substances" as contemplated by section 280E.  Petitioners argue that, as a management services company, Wellness did not itself engage in the purchase and sale of marijuana.  But the only difference between what Alternative did and what Wellness did (since Alternative acted only through Wellness) is that Alternative had title to the marijuana and Wellness did not.  Wellness employees were directly involved in the provision of medical marijuana to the patient-members of Alternative's dispensary.  While Wellness and Alternative were legally separate, Wellness employees were engaged in the purchase and sale of marijuana (albeit on behalf of Alternative); that was Wellness' primary business.  We do not read the term "trafficking" to require Wellness to have had title to the marijuana its employees were purchasing and selling.  Neither that section nor the nontax statute on trafficking limits application to sales on one's own behalf rather

than on behalf of another. Without clear authority, we will not read such a limitation into these provisions.

We, therefore, hold that Wellness was engaged in the business of "trafficking in controlled substances" during the taxable years at issue. And, to the extent Wellness engaged in nontrafficking activities, the record before us does not allow us to allocate expenses between marijuana-related and non-marijuana-related activities.

Petitioners also argue that applying section 280E to both Alternative and Wellness is inequitable because deductions for the same activities would be disallowed twice. These tax consequences are a direct result of the organizational structure petitioners employed, and petitioners have identified no legal basis for remedy.

We, therefore, hold that Mr. Duncan, Mr. Kwit, and Mr. Rozmarin each have additional taxable income from Wellness resulting from the denial of deductions pursuant to section 280E.

## IV. Cost of Goods Sold

Next, we must determine whether Alternative is entitled to a COGS amount greater than respondent allowed for the taxable years at issue.

A taxpayer engaged in manufacturing or merchandising can subtract COGS from gross receipts to arrive at gross income. See secs. 1.61-3(a), 1.162-1(a), Income Tax Regs.; see also Feinberg v. Commissioner, T.C. Memo. 2017-211, at *10; Rodriguez v. Commissioner, T.C. Memo. 2009-22, 2009 WL 211430, at *3. COGS is not a deduction but an offset to gross receipts for the purpose of calculating gross income. See Feinberg v. Commissioner, at *11; Kazhukauskas v. Commissioner, T.C. Memo. 2012-191, 2012 WL 2848694, at *9. A taxpayer is required to maintain sufficient reliable records to allow the Commissioner to verify the taxpayer's income and expenditures. See sec. 6001; Olive v. Commissioner, 139 T.C. at 33. COGS is generally determined under section 471 and the accompanying regulations. See secs. 1.471-3, 1.471-11, Income Tax Regs. Producers must include in COGS both the direct and indirect costs of creating their inventory. See secs. 1.471-3(c), 1.471-11, Income Tax Regs. Section 471 and its regulations also direct taxpayers to section 263A for additional rules. That section instructs both producers and resellers to include "indirect" inventory costs in COGS. Sec. 263A(a)(2)(B), (b); sec. 1.263A-1(a)(3), (c)(1), (e), Income Tax Regs. It also broadens the definition of indirect costs for both types of taxpayers. Compare sec. 1.263A-1(e)(3), Income Tax Regs., with sec. 1.471-11, Income Tax Regs.

Petitioners first argue that, under section 263A, Alternative is entitled to include both direct and indirect costs of its inventory in computing COGS. Petitioners do not specify what additional expenses should be allowed beyond the COGS offsets that respondent already allowed; rather they ask the Court to consider Mr. Duncan's testimony regarding the square footage of the dispensary and a general overhead estimate as well as Ms. de la Rionda's estimates regarding employee time and related costs.

Section 263A puts into COGS only expenses otherwise deductible. See Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647, sec. 1008(b)(1), 102 Stat. at 3437 ("Any cost which (but for this subsection) could not be taken into account in computing taxable income for any taxable year shall not be treated as a cost described in this paragraph."). Here, the expenses petitioners have reported are not deductible. Petitioners are correct that Congress cannot take away COGS, but that is not what section 263A does. It adds otherwise deductible expenses to COGS. Because by operation of section 280E these indirect expenses are not deductible, they cannot be added to COGS. Patients Mutual, 151 T.C. at ___ (slip op. at 19).

Petitioners further argue that Alternative is a "producer" for purposes of sections 263A and 471 and is therefore entitled to include its "production" costs in

inventory. We find that Alternative is not a "producer" for purposes of section 263A or 471. Under section 263A and its accompanying regulations, "[t]he term 'produce' includes construct, build, install, manufacture, develop, * * * improve", "create, raise, or grow." Sec. 263A(g)(1); sec. 1.263A-2(a)(1), Income Tax Regs. Under the section 471 regulations, "[c]osts are considered to be production costs to the extent that they are incident to and necessary for production or manufacturing operations or processes." Sec. 1.471-11(b)(1), Income Tax Regs.

Petitioners have not shown that Alternative was a "producer" of the marijuana products it purchased from its patient-members. Certain of Alternative's product offerings required some additional preparation and maintenance. But we are unable to conclude that the dispensary grew, created, or improved its marijuana products to the extent required by section 263A or 471 when the only evidence before us is that the dispensary inspected, packaged, trimmed, dried, and maintained the stock. Patients Mutual, 151 T.C. at ___ (slip op. at 60-62). Further, even were we to allow Alternative to include such costs, petitioners have not offered a reasonable basis upon which to compute the additional amounts of COGS.

We also reject Alternative's argument that, under Suzy's Zoo v. Commissioner, 114 T.C. 1 (2000), aff'd, 273 F.3d 875 (9th Cir. 2001), it was a

"producer" as it was the owner of the marijuana produced by its patient-members.
A taxpayer is considered a "producer" if it is an owner of the property produced
under Federal income tax principles. Sec. 1.263A-2(a)(1)(ii)(A), Income Tax
Regs. An ownership determination is made on the basis of "all of the facts and
circumstances, including the various benefits and burdens of ownership vested
with the taxpayer." Id. Mr. Duncan testified that the dispensary had oral
agreements with its patient-members to grow the marijuana and create marijuana
products. But no other evidence supports petitioners' claim that Alternative
owned the marijuana products produced by its patient-members until Alternative
paid them for their products. Further, even if patient-members had to sell to
Alternative, employees had complete discretion over whether to purchase the
marijuana products from the patient-members and compensated the patient-
members only if their marijuana was purchased. See Patients Mutual, 151 T.C. at
___ (slip op. at 62).

Petitioners have not established that Alternative's relationship with its
patient-members was the type of contract-manufacturing arrangement the Court of
Appeals recognized in Suzy's Zoo v. Commissioner, 273 F.3d at 877. We
conclude instead that Alternative was a reseller of the marijuana products it
purchased.

We, therefore, hold that petitioners are limited to the COGS respondent has already allowed for the taxable years at issue.

## V. Section 6662(a) Penalty[14]

Finally, we must determine whether Alternative is liable for the section 6662(a) accuracy-related penalty for the 2009 and 2010 taxable years. Section 6662(a) and (b)(1) and (2) imposes a penalty equal to 20% of the portion of an underpayment of tax required to be shown on the return that is attributable to "negligence or disregard of rules or regulations" and/or a "substantial understatement of income tax." Negligence includes "any failure to make a reasonable attempt to comply with the provisions of this title". Sec. 6662(c). We have defined negligence as the failure to exercise due care or the failure to do what a reasonable person would do under the circumstances. See Allen v. Commissioner, 92 T.C. 1, 12 (1989), aff'd, 925 F.2d 348 (9th Cir. 1991); Neely v. Commissioner, 85 T.C. 934, 947 (1985). With respect to corporations, an understatement of income tax is "substantial" if it exceeds the greater of 10% of

---

[14] As we have stated above, Mr. Duncan, Mr. Kwit, and Mr. Rozmarin have conceded their liability for additions to tax to the extent we find that underpayments exist for the relevant taxable years. As we have determined that petitioners underreported their income with respect to their ownership interests in Wellness, Mr. Duncan, Mr. Kwit, and Mr. Rozmarin are liable for these additions to tax.

the tax required to be shown on the return or $10,000 (or if it exceeds $10,000,000). Sec. 6662(d)(1).

An understatement may be reduced if the taxpayer had substantial authority for its return position. Sec. 6662(d)(2)(B); see Campbell v. Commissioner, 134 T.C. 20, 30 (2010), aff'd, 658 F.3d 1255 (11th Cir. 2011); sec. 1.6662-4(a), Income Tax Regs. "Substantial authority is an objective standard based on an analysis of the law and its application to the relevant facts." See Campbell v. Commissioner, 134 T.C. at 30 (citing Myers v. Commissioner, T.C. Memo. 1994-529). And substantial authority exists only if the weight of the authorities supporting the return position is substantial in relation to the weight of authorities supporting contrary treatment. See id. (citing O'Malley v. Commissioner, T.C. Memo. 2007-79).

An understatement also may be reduced if the taxpayer adequately disclosed the position and had a reasonable basis for the position. Sec. 6662(d)(2)(B); see Campbell v. Commissioner, 134 T.C. at 30; sec. 1.6662-4(a), Income Tax Regs. Disclosure generally must be made on Form 8275, Disclosure Statement, unless otherwise permitted by an applicable revenue procedure. Sec. 1.6662-4(f), Income Tax Regs.; see Campbell v. Commissioner, 134 T.C. at 31. And reasonable basis is a relatively high standard of reporting; taxpayers must have a position that is

more than merely arguable. Sec. 1.6662-3(b)(3), Income Tax Regs.; see Campbell v. Commissioner, 134 T.C. at 31.

Petitioners did not argue that Alternative had substantial authority for its position or that they disclosed the section 280E issue and had a reasonable basis. Respondent, therefore, asserts that petitioners waived this argument. We agree and hold that Alternative had substantial understatements of income tax for the years at issue.[15]

A taxpayer may avoid a section 6662(a) penalty if it can show reasonable cause for the resulting underpayment and that it acted in good faith. Sec. 6664(c). The decision as to whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. See sec. 1.6664-4(b)(1), Income Tax Regs. Generally, the most

---

[15] The burden of production as to the penalty remains on Alternative because sec. 7491(c) does not apply to corporations. See NT, Inc. v. Commissioner, 126 T.C. 191, 195 (2006). In addition, in Dynamo Holdings Ltd. P'ship v. Commissioner, 150 T.C. ___, ___ (slip op. at 13) (May 7, 2018), we held that the Commissioner does not have the burden of production as to supervisory approval under sec. 6751(b) for a penalty determined against a corporation in a notice of deficiency. Respondent has filed a motion to reopen the record and admit evidence pertaining to his compliance with sec. 6751(b)(1) here. As we held in Dynamo that the Commissioner has no burden of production with respect to sec. 6751(b), and Alternative did not argue that respondent failed to comply with that provision, we will deny as moot respondent's motion to reopen the record.

important factor is the extent of the taxpayer's efforts to assess the proper tax liability. Id.; see Halby v. Commissioner, T.C. Memo. 2009-204. Reliance on professional advice may constitute reasonable cause and good faith if the taxpayer proves, by a preponderance of the evidence, that it "meets each requirement of the following three-prong test: (1) [t]he advisor was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the advisor, and (3) the taxpayer actually relied in good faith on the adviser's judgment." Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); see Hudson v. Commissioner, T.C. Memo. 2017-221.

Petitioners argue that, given the unsettled caselaw and confusion surrounding section 280E (in their view) at the time the tax returns were prepared and filed, it would be unfair to impose an accuracy-related penalty. Petitioners note that during the years at issue, the only relevant case was CHAMP, and that the Court in CHAMP allowed the taxpayer to deduct a large percentage of its expenses despite its provision of medical marijuana. As we outlined above, the factual circumstances that enabled the Court in CHAMP to allocate expenses between the taxpayer's businesses are absent from the case before us. The only directly relevant authority available was directly against petitioners' tax treatment.

Alternative failed to state anywhere on its returns that it was involved in the distribution of marijuana or that section 280E was at issue in any way. Alternative stated on its return only that its business activity was "Medicine Sales". And Alternative offered insufficient evidence that it sought advice regarding proper tax treatment for its transactions. While Alternative hired an accountant believed to have experience with marijuana dispensaries, Alternative provided no evidence that it relied on the accountant for advice on whether section 280E applied. Indeed, the record shows that Alternative only provided its accountant financial statements to prepare its returns. And merely hiring a professional to prepare an income tax return--without giving him necessary information or relying on his advice--does not absolve a taxpayer from liability of a penalty. See, e.g., Povolny Grp., Inc. v. Commissioner, T.C. Memo. 2018-37, at *27-*28; Bronson v. Commissioner, T.C. Memo. 2012-17, 2012 WL 129803, at *12-*13, aff'd, 591 F. App'x 625 (9th Cir. 2015).

We, therefore, hold that Alternative is liable for the section 6662(a) accuracy-related penalty for the taxable years at issue.

We have considered all of the arguments made by the parties and, to the extent they are not addressed above, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

An appropriate order will be issued, and decisions will be entered under Rule 155.